**BEAVERCREEK LOCAL SCHOOLS, Appellant and Cross–Appellee,**

**v.**

**BASIC, INC., Appellee and Cross–Appellant.**

[Cite as *Beavercreek Local Schools v. Basic, Inc.* (1991), 71 Ohio App.3d 669.]

Court of Appeals of Ohio,
Greene County.

No. 89 CA 88.

Decided March 6, 1991.

670

**672**

*Carlile, Patchen, Murphy & Allison, Laurence E. Sturtz* and *James C. Carpenter,* for appellant and cross-appellee.

*Arter & Hadden, David C. Patterson* and *Jeffrey C. House,* for appellee and cross-appellant.

FAIN, Judge.

Both parties have appealed from a judgment rendered in favor of plaintiff-appellant Beavercreek Local Schools (Beavercreek) and against defendant-appellee Basic, Inc., in the amount of $250,000. The judgment was entered pursuant to a jury verdict.

Beavercreek contends that the trial court committed prejudicial error by admitting the hearsay testimony of Basic's expert witness regarding the conclusions of the Harvard/Kennedy School of Government Symposium on Public Policy and Asbestos in Buildings; that the theory and conclusions of the Harvard Symposium were not disclosed pursuant to requests for discovery and should have been excluded from evidence on that ground; that the jury failed to include in the amount of damages the cost of removing asbestos from the Beavercreek schools; and that the trial court prejudicially restricted voir dire.

We conclude that the trial court erred in admitting hearsay testimony of the expert witness; that there were no other grounds for excluding the theory set forth as the conclusion of the Harvard Symposium; that the jury erred by not including the cost of removing the asbestos from Beavercreek's schools within the damages awarded; and that the trial court did not prejudicially restrict voir dire.

Basic contends that the trial court erred in denying Basic's motion for summary judgment; in granting Beavercreek's motion for a directed verdict on the statute of limitations defense; and in instructing the jury to apply both the consumer expectation test and the risk-utility test in determining whether Basic's plaster was defective.

We conclude that the trial court erred in denying Basic's motion for summary judgment on the statute of limitations issue; and that the trial court was correct in instructing the jury to apply both the consumer expectation and risk-utility prongs of the test to determine whether Basic's plaster was defective.

Because we conclude that the trial court should have granted Basic's motion for summary judgment, the judgment against Basic is reversed, and we are entering judgment in Basic's favor in accordance with App.R. 12(B).

## I

Basic, Inc. manufactured and sold Kilnoise, an asbestos-containing acoustical plaster, to the Beavercreek Local Schools. Kilnoise was installed in three Beavercreek schools between approximately 1955 and 1962.

During 1979, Beavercreek became aware of the health risks associated with asbestos, discovered asbestos in three school buildings, and later, in 1980, encapsulated the ceilings containing Kilnoise with a coat of paint.

Beavercreek filed an action in 1985 against several manufacturers and distributors of asbestos-containing ceiling plaster. In 1986, Beavercreek amended its complaint to include Basic as a party defendant. Basic moved for summary judgment on the ground that Beavercreek's claims were barred by the applicable statute of limitations. This motion was denied. All other defendants were dismissed from the action except for Basic. Beavercreek eventually reduced its claim to one cause of action, in which it sought to recover the costs of removal and replacement of Kilnoise from three schools based upon strict liability in tort.

At a pretrial hearing, the trial court indicated that it intended to restrict voir dire. Beavercreek objected to the voir dire instructions and filed a motion to allow individual examination of prospective jurors. The trial court restricted Beavercreek's voir dire during the trial.

The trial court granted Beavercreek's motion for a directed verdict on the statute of limitations defense, thereby removing that issue from the jury's consideration.

The trial court instructed the jury that it should apply both the consumer expectation test and the risk-utility test to determine whether Basic's plaster was defective. The jury returned a verdict in favor of Beavercreek. The jury found that:

"(1) Plaintiff proved, by a preponderance of the evidence and based upon the court's instructions of law, that Basic, Inc. manufactured and supplied a defective product to the Beavercreek Local Schools; and that

"(2) Plaintiff proved, by a preponderance of the evidence and based upon the court's instructions of law, that the product of Basic, Inc. proximately caused the Beavercreek Local School's injury."

However, the jury awarded Beavercreek only $250,000 for the damages proximately caused by Basic. This amount was based upon the cost of maintaining the plaster in the schools for twenty years. The award did not include any costs to remove and replace the plaster.

Beavercreek's motion for additur and for judgment notwithstanding the verdict, or, in the alternative, for a new trial on the issue of damages, was overruled. Beavercreek appeals from the judgment entry as it relates to the amount of damages as well as from the denial of its motion for a new trial on the issue of damages. Basic subsequently filed its notice of cross-appeal.

## II

Beavercreek's first assignment of error is as follows:

"The trial court erred to the prejudice of Beavercreek Schools by admitting into evidence inadmissible hearsay testimony."

Beavercreek contends that the following expert testimony referring to the Harvard Symposium's conclusion that it was safer to leave the asbestos in buildings rather than to remove it constitutes inadmissible hearsay testimony:

"*They* reached the conclusion, with what we have learned about removal in the last several years, an option that looked like a very clean-cut, it just disappears, good-bye, is that the creation of dust and removal poses inordinate exposure to the removal people of which there are some 50,000 now, and it's very hard to protect them properly in this high dust atmosphere, reminiscent of the old occupational exposures, and second, it's very hard to contain the dust for the bystanders in the building because many removals have been done by sectioning off portions of the building, and you have bystander exposure, and third, we have learned you can't get it out of many buildings. The dust has now penetrated all the cracks and crevices, and when air measurements are made post-abatement, there is good evidence that many buildings are more contaminated after removal, in terms of what you breathe, than before removal, and, therefore, *the symposium concluded* removal, [being] the major option utilized up to that time should be very carefully considered, and operations and maintenance appear to be the best way of proceeding." (Emphasis added.)

The testimony of Basic's expert witness was a subject of Basic's closing argument:

"Why don't you remove it and just get rid of it altogether? Well, Dr. Corn told you that he recently attended a symposium by scientists from various parts of the world dealing just with the question of overreaction to asbestos in buildings and removing versus keeping it in place because of the environmental dangers that can be created by stirring things up in a situation where it simply doesn't need to be done."

"Hearsay" is defined in Evid.R. 801 as:

" * * * a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Unless an exception applies under Evid.R. 803 or 804, hearsay statements are not admissible pursuant to Evid.R. 802, which provides that:

"Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio."

Hearsay testimony does not afford the opposing party an opportunity to confront and to cross-examine the out-of-court declarant, thereby depriving the party of the "guaranty of truthfulness resulting from the oath of [the] declarant." Furthermore, the opportunity to test the accuracy of the declarant's observations is not present when hearsay statements are admitted into evidence. *Potter v. Baker* (1955), 162 Ohio St. 488, 494, 55 O.O. 389, 392, 124 N.E.2d 140, 144. Therefore, hearsay statements generally lack indicia of reliability and are not admissible pursuant to Evid.R. 802.

The Ohio Rules of Evidence do not incorporate the learned treatise exception to the hearsay rule incorporated in Fed.Evid.R. 803(18), which provides an exception to the hearsay rule:

"To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits."

See *Kane v. Ford Motor Co.* (1984), 17 Ohio App.3d 111, 112, 17 OBR 173, 174–175, 477 N.E.2d 662, 664–665. Therefore, a fine line must be drawn between an expert opinion which has incorporated the scholarly opinions of others, and the direct quotation of the opinions or conclusions of other

experts, which is not permitted. *Id.* at 112, 17 OBR at 174–175, 477 N.E.2d at 664–665.

"Even the mentioning of the titles of the articles would preclude the * * * [opposing party] from having the opportunity of adequate cross-examination as to the truth of the matters contained therein. It is apparent that the drafters of the Ohio Rules of Evidence intended to preserve inviolate a litigant's right to confrontation. They also were undoubtedly aware of how difficult it is for the average juror to grasp the fine distinction attorneys draw when admitting a piece of evidence when it is not offered for the truth contained therein, but merely for the purpose that a statement was made. As a result, direct quotation is not permitted under the Ohio Rules." *Steinfurth v. Armstrong World Indus.* (1986), 27 Ohio Misc.2d 21, 23, 27 OBR 206, 208–209, 500 N.E.2d 409, 412.

In the case before us, Dr. Corn was permitted to state the conclusions of the Harvard/Kennedy School of Government Symposium on Public Policy and Asbestos in Buildings, which goes further than merely mentioning the title or author of a treatise. The testimony of Corn included the following:

"Q. Have you participated personally in symposiums dealing with these precise issues?

"A. Yes, I have.

"Q. And, in fact, did the report of one such symposium become circulated this past week?

"A. The report of a very influential one was made available a week ago Monday.

"Q. And would you tell the Jury a little bit about the symposium? What was the name of it?

"A. It was the Harvard/Kennedy School of Government Symposium on Public Policy and Asbestos in Buildings, and it was a scientific workshop.

"Q. Can you tell the Jury what groups of the scientific community participated in the symposium?

"A. They were individuals representing universities as diverse as Harvard, New York University, Johns Hopkins, Yale. The attendees are listed in the back of the report. We each prepared papers on the subject areas we had some expertise in. They will be published as a volume, and then a summary was issued Monday to the public and the press.

"Q. Did you personally participate as a speaker?

"A. I prepared a paper on asbestos, airborne assessment of asbestos in buildings.

"Q. What conclusions were drawn by the symposium with regard to concerns about asbestos removal versus asbestos maintenance in buildings?

"MR. STURTZ: Objection.

" * * *

"Q. I will withdraw the question and try to be a bit more precise, Dr. Corn. Did the symposium discuss the subject of the merits of removal versus operations and maintenance?

"A. Yes.

"Q. Did the symposium discuss problems that had been created by removals in the past few years?

"A. Yes.

"Q. Did the symposium reach a conclusion as to the relative merits of removal versus leaving the product in place?

"A. Yes.

"Q. Okay. What was that?

"MR. STURTZ: Objection.

"THE COURT: The objection is overruled, exception is noted."

The record reveals that Corn was permitted to relay the conclusions of the Harvard Symposium to the jury. The conclusions stated presumably represented the collective opinion of the members of the symposium, not just the opinion of Corn, nor were they merely used as the basis for Corn's opinion.

Basic contends that because Corn was an actual participant in the Harvard Symposium, his testimony was not hearsay—that "he properly stated an opinion based on facts and data perceived by him." We do not agree. Corn was not asked merely to state his own opinion; he was asked to state the conclusions of the symposium, generally. While Corn could be cross-examined concerning the basis for his own conclusions, Beavercreek had no opportunity to cross-examine the other symposium participants concerning their reasoning and the bases for their conclusions. Therefore, we conclude that this testimony was inadmissible hearsay.

■ During the hearing on Beavercreek's motion notwithstanding the verdict or in the alternative a motion for a new trial on the issue of damages only, the trial court opined that the jury was impressed with Corn's testimony and took his position.

"Counsel: * * * As Dr. Corn indicated, he believes that that was a wholly inappropriate response, just as the padlocking of the school was a wholly

inappropriate response, and the Jury believed Dr. Corn. It's that simple. So the damage—

"THE COURT: From my vantage point, opposing Counsel alluded to the fact that I talked with the Jury after the verdict, and I do have a somewhat superior position simply by virtue of that opportunity that you men do, which you are right. That's precisely what happened. They bought Dr. Corn right down the line.

"That was said not in quite those words, but the words used were such that made me think that they were very, very impressed with the Doctor's testimony, and they took, bought, if you will, his position. Go ahead.

"MR. PATTERSON: So it's very clear that we had hotly-contested expert testimony on these issues, and the Jury properly used their discretion in making a finding that removal is not what you need to do in these buildings today. We are not going to charge the manufacturer with the cost of doing that, purely and simply."

The transcript reveals that the jury was presented with opposing expert testimony regarding whether the asbestos should be maintained, or removed. Both parties agree that the most likely explanation for the jury's $250,000 damage award is that the jury relied upon the testimony of Corn in concluding that the more reasonable solution to the asbestos problem would be to maintain the asbestos in place rather than to remove the asbestos. Therefore, we conclude that the hearsay evidence improperly admitted was prejudicial to Beavercreek.

Beavercreek's first assignment of error is sustained.

### III

Beavercreek's second assignment of error is as follows:

"The trial court erred by admitting into evidence testimony not disclosed during discovery to the prejudice and surprise of Beavercreek Schools."

Beavercreek claims that during discovery, Basic and Corn failed to disclose the Harvard Symposium's conclusion that in some cases it is better to manage asbestos rather than remove it from buildings. Beavercreek relies upon the deposition of Corn as a basis for its claim that Corn gave incomplete responses to questions asked during the discovery process, and, therefore, Basic had a duty to later supplement his response.

The deposition of Corn was not admitted into evidence during the trial, nor was it filed until after the trial was concluded and a notice of appeal was filed; therefore, the deposition is not properly a part of the record on appeal. Even if the deposition were part of the record on appeal and properly before this

court, we would conclude that Basic was under no duty pursuant to Civ.R. 26(E) to supplement its expert witness' response to questions asked during the deposition for two reasons:

First, Corn's answers were complete in response to the questions posed by Beavercreek. Although Corn did not mention the conclusions of the Harvard Symposium as being part of the basis for his opinion, he was never asked to give the basis for his opinion.

A more fundamental problem is that the duty seasonably to supplement responses to discovery is addressed to *parties*, not non-party witnesses.

Civ.R. 26(E) provides, in pertinent part, as follows:

"Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

"(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (a) the identity and location of persons having knowledge of discoverable matters, and (b) the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify.

"(2) A party who knows or later learns that his response is incorrect is under a duty seasonably to correct the response."

We can find nothing in the foregoing that would impose a duty on a non-party witness to supplement or to correct deposition testimony.

▉ Beavercreek asserts that Basic was required to supplement its response regarding the *subject matter* of Corn's testimony to encompass the symposium's conclusions. Civ.R. 26(B)(4)(b) requires a party to reveal the identify of persons expected to testify as expert witnesses and to state the subject matter on which the expert is expected to testify. We construe the term "subject matter" to encompass a broad scope of information under a general topic, and not to include a detailed accounting of an expert's possible testimony. Beavercreek's second assignment of error is overruled.

## IV

Beavercreek's third assignment of error is as follows:

"The jury erred in reaching its verdict as it relates to damages and the trial court erred in failing to grant a new trial on the issue of damages."

▉ Beavercreek contends that the judgment is against the weight of the evidence and that inadequate damages were awarded as a result of passion

and prejudice. Specifically, Beavercreek asserts that it was undisputed at trial that it must remove all of the Kilnoise from its schools pursuant to the Environmental Protection Agency National Emission Standard for Asbestos at a cost of approximately $1,500,000 to $1,900,000. The jury was presented with uncontroverted EPA standards requiring that the asbestos be removed when a building of more than one hundred sixty square feet is renovated or demolished. Other alternatives available during the life of the building include encapsulating the asbestos, painting it, putting other material on it, or leaving it alone all while establishing an operations and maintenance program. However, Beavercreek will ultimately be faced with the requirement of removing the asbestos at the end of the life of the building. There was testimony that the expected life of these buildings is about twenty years. The jury only awarded Beavercreek compensation to cover the cost of maintaining the asbestos for a twenty-year period.

Beavercreek contends that because federal law requires it to remove the asbestos at some point in the future, and there was evidence of the current cost, the jury had to award as part of the damages the cost of removing the asbestos from its school buildings. " 'A new trial is warranted on the ground of inadequacy of damages where it appears from the record that the jury failed to consider an element of damages raised by uncontroverted expert testimony.' " *Slivka v. C.W. Transport, Inc.* (1988), 49 Ohio App.3d 79, 550 N.E.2d 196, paragraph two of the syllabus, quoting *Baum v. Augenstein* (1983), 10 Ohio App.3d 106, 10 OBR 129, 460 N.E.2d 701, paragraph two of the syllabus.

Based upon uncontroverted testimony in the record, Beavercreek must eventually remove all the asbestos from three of its school buildings at a cost of approximately $1,500,000 to $1,900,000, pursuant to federal regulations. The jury was instructed that if it were to find that Beavercreek had proven by a preponderance of the evidence the existence and amount of damages with reasonable certainty, it must award a dollar amount to compensate Beavercreek for the actual damages proximately caused by the defects in Basic's product.

We agree with Beavercreek that the jury's failure to award more than the cost of maintaining the asbestos is inexplicable in view of the uncontroverted testimony that Beavercreek would be faced with the necessity of removing the asbestos at the end of the life of the buildings, and in view of the testimony that the present cost of removal would be from $1,500,000 to $1,900,000. While some discounting of this figure to present value would be warranted (there was no testimony on this subject), that discounting would be offset, at

least to some extent, by the probable impact of inflation upon the future cost of removing the asbestos.

We agree with Beavercreek that the failure to award any component of damages for the cost of removing the asbestos was against the manifest weight of the evidence in this case.

Beavercreek's third assignment of error is sustained.

## V

Beavercreek's fourth assignment of error is as follows:

"The trial court erred to the prejudice of Beavercreek Schools by improperly restricting *voir dire.*"

Beavercreek contends that because the trial court restricted voir dire, it was unable to exercise its peremptory challenges intelligently and intuitively, and, therefore, was prejudiced by not being able to exclude jurors who it feared would fail to apply the law because they themselves did not follow laws and safety regulations.

Civ.R. 49(A) permits a trial court to conduct the examination of prospective jurors. If the court chooses to conduct the voir dire, it must provide the parties an opportunity to supplement the examination by further inquiry. However, the court retains discretion to impose reasonable limits upon counsel's voir dire. *State v. Bridgeman* (1977), 51 Ohio App.2d 105, 109–110, 5 O.O.3d 275, 277–278, 366 N.E.2d 1378, 1382–1383; *State v. Swanson* (1984), 16 Ohio App.3d 375, 16 OBR 430, 476 N.E.2d 672, paragraph one of syllabus. A trial court may limit the scope of voir dire, and only upon a showing of abuse of discretion will the decision be reversed. *State v. Hinders* (Oct. 30, 1989), Montgomery App. No. 10750, unreported, 1989 WL 130796. Furthermore, it is reasonable for a trial court to dictate the form of the questions and to require that the questions be asked generally of all veniremen rather than individually. *Id.* In the instant case, the trial court stated during pretrial hearing that its practice was to question the venire generally rather than individually, and that if further exploration is necessary after an initial answer, counsel is permitted to pursue the line of questioning to a legitimate end. The trial court's policy in this regard was both reasonable and within its discretion.

During the trial, Beavercreek conducted individual questioning, and the following dialogue transpired:

"COUNSEL: Thank you, Your Honor. Good morning. Ladies and gentlemen. I have a few questions to ask of you pursuing some of the things that the Judge asked or a few other areas.

"First, I would like to go into the few areas that the Judge has not talked about. Are any of you smokers?

"THE COURT: Could you tell me what possible relevance that might have, sir?

" * * *

"COUNSEL: It please the Court, there is going to be testimony from expert witnesses as to the complicating effect of smoking and breathing asbestos, and I need to inquire as to the impact it's going to have on this Jury. It's an enhanced health risk, and it's agreed to by all parties.

"THE COURT: Why don't we ask a preliminary question. Ladies and gentlemen, this is addressed to all of you, particularly to those who are seated, but generally to all of the venire, have any of you folks, to your knowledge, worked or lived in an environment where asbestos or asbestos materials were present to your knowledge?

" * * *

"THE COURT: Now, do you want to pursue the smoking question, Mr. Sturtz?

"COUNSEL: Yes, we would, with the Court's permission.

"THE COURT: The Court is going to deny you that opportunity. You may have your exception. I don't think its germane or relevant to the questions here.

"COUNSEL: Let me ask the panel as a whole, are you familiar with the Surgeon General's advice on smoking in society? Is there anyone who is not familiar with those regulations?

"Do you feel as a group that it's appropriate for the government to deal with things such as smoking in the general population? Is there anyone that feels that the government has no place in dealing with those issues?

" * * *

"COUNSEL: Mr. Lewis, do you wear a hard hat or steel toe shoes in your employment?

"JUROR NO. 1: I did, but I'm retired.

"THE COURT: Excuse me, Mr. Lewis. Why is that germane?

"COUNSEL: Your Honor, I'm interested in the people's impression of safety regulations and how they impact them, and if that's an appropriate concern for their government.

"THE COURT: You have asked them whether or not the safety regulations are an appropriate concern of the government, and we are not going to, Mr. Sturtz, talk to every Juror about whether they wear hard hats or steel toed shoes. You may have your exception to the Court's ruling."

While the trial court prohibited extensive, individual questions into areas such as smoking and hard hats, it did permit general questions to the panel covering the areas of concern to counsel. We conclude that the trial court did not abuse its discretion in prohibiting Beavercreek from asking detailed, individual questions of the venire.

Beavercreek's fourth assignment of error is overruled.

## VI

In its cross-appeal, Basic has asserted two assignments of error. Basic's first assignment of error is as follows:

"The trial court erred in denying Basic Incorporated's motion for summary judgment and in granting Beavercreek Local Schools' motion for a directed verdict on the statute of limitations defense."

■■■ Basic contends that Beavercreek's strict products liability claim was not timely filed within four years after it accrued pursuant to R.C. 2305.09(D), which requires that an "action for injury" to plaintiff's rights which does not arise out of contract or is not governed by certain enumerated statutes of limitations must be brought within four years after the cause of action accrues. R.C. 2305.09(D) provides:

"An action for any of the following causes shall be brought within four years after the cause thereof accrued:

" * * *

"(D) For an injury to the rights of the plaintiff not arising on contract nor enumerated in sections 2305.10 to 2305.12, inclusive, 2305.14 and 1304.29 of the Revised Code.

"If the action is for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it is for fraud, until the fraud is discovered."

Beavercreek is not immune from the application of the statutes of limitations. While the state of Ohio is not subject to the general requirements of

statutes of limitations, unless specifically provided for in the statute, the state's exemption is an attribute of sovereignty only. The exemption from limitations does not extend to school districts or boards of education. *Ohio Dept. of Transp. v. Sullivan* (1988), 38 Ohio St.3d 137, 139, 527 N.E.2d 798, 799–800; *State ex rel. Bd. of Edn. v. Gibson* (1935), 130 Ohio St. 318, 4 O.O. 352, 199 N.E. 185, paragraph two of the syllabus. "A board of education or school district, clothed with the capacity to sue and be sued, is thereby rendered amenable to the laws governing litigants, including the plea of the statute of limitations." *Id.*

 Basic filed a motion for summary judgment on the statute of limitations issue. To render summary judgment, a trial court must find: "(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46.

The parties do not disagree as to the applicable statute of limitations, but do disagree as to when the limitations period began to run in this case.

Both parties rely on the proposition that a cause of action accrues when the plaintiff knew, or by the exercise of reasonable diligence, should have known, that it had been injured by the conduct of defendant. *O'Stricker v. Jim Walter Corp.* (1983), 4 Ohio St.3d 84, 4 OBR 335, 447 N.E.2d 727.[1]

Certain facts before the trial court comprising a chain of events which began in 1979 are undisputed. It was stipulated by the parties that the acoustical plaster installed in three Beavercreek schools between April 1953 and December 31, 1961, was Kilnoise acoustical plaster. Basic was the manufacturer of Kilnoise acoustical plaster from August 1955 to January 1962.

In April 1979, Beavercreek's administrative assistant for business, Donald Fletcher, received a letter from the Greene County Health Department advising of the risks due to the exposure of asbestos in schools, mailings from the State Department of Education regarding asbestos danger in schools, and literature in professional magazines from professional organizations such as

---

1. An issue is raised as to whether the discovery rule as to when a cause of action accrues is applicable under R.C. 2305.09(D). *Investors REIT One v. Jacobs* (1989), 46 Ohio St.3d 176, 546 N.E.2d 206, paragraph 2b of syllabus; *Velotta v. Leo Petronzio Landscaping, Inc.* (1982), 69 Ohio St.2d 376, 23 O.O.3d 346, 433 N.E.2d 147; *Wisecup v. Gulf Dev.* (1989), 56 Ohio App.3d 162, 565 N.E.2d 865. However, we conclude that in the case before us, the final result would remain the same if the *Investors REIT One* analysis is followed.

Association of School Business Officials, Ohio School Board Association and the EPA, alerting school officials about the potential hazards of asbestos in school buildings. Beavercreek then proceeded to investigate the possible asbestos condition in its schools. Ceiling samples were tested and the presence of asbestos content was found. The Greene County Health Department and Ohio Department of Health inspected the school buildings. Air monitoring tests were taken and David E. Kos, Safety and Health Consultant for the Division of Occupational Health of the Ohio Department of Health, reported to school officials in May 1980, the following:

"This report concerns the survey that I conducted at the Beavercreek High School on March 4, 1980. The purpose of the survey was to perform air monitoring tests throughout the school in order to determine if an asbestos health hazard exists. Assisting me during the survey were: Gary Mills, Green [sic] County Sanitarian; Dale Tackett, Maintenance Superintendent; and yourself.

" * * *

"*Survey Observations*

"During the survey certain observations were made that merit a description. These observations include:

"1. Beavercreek High School was built in four phases during the time periods of 1954, 1956, 1958, and 1960.

"2. The ceilings throughout the school are covered with approximately 167,000 square feet of asbestos containing acoustic plaster.

"a. Bulk sample analysis of ceiling material has been found to contain asbestos according to reports from Belmont Park and Tri–State Laboratories, Inc.

" * * *

"*Discussion/Recommendation*

"The fiber counts measured in the seven area air samples are low. Furthermore, the fiber counts are below the current Occupational Safety and Heal [sic] Administration (OSHA) standard and the American Conference of Governmental Industrial Hygienists (ACGIH) recommended threshold limit value (TLV) of 2 f/cc (fibers per cubic centimeter of air). Due to low fiber counts and the satisfactory condition of the ceiling, an asbestos health hazard does not appear to exist at this time.

"Although the ceiling surfaces in the school appear to be in good condition, there are several areas where there is noticeable damage or deterioration as previously described. Based upon the observations and laboratory results, the following recommendations are made for your consideration.

*" * * *

"4. In making any of the repairs certain precautions should be followed:

"a. The damaged surfaces should be moistened slightly to reduce the generation of dust, fibers, and other debris.

"b. Any was [*sic*] material should be moistened before being picked up and discarded in plastic bags prior to disposal. Floors in these areas should be wet mopped to reduce the generation of dust.

"c. Workers should wear respirators approved for use with asbestos in making the repairs.

"d. These precautions and others are described in the two part U.S. Environmental Protection Agency (EPA) publication entitled, 'Asbestos–Containing Materials in School Buildings: A Guidance Document'. These publications are enclosed with this report;

"5. *As a preventive approach, it is strongly suggested that the undamaged acoustic plastered ceilings be painted or coated with a good quality latex paint.*

"a. The paint should be applied with a roller rather than a spray gun.

"b. There are good discussions on this technique in the enclosed report on sealants and the New York City Board of Education's 'Asbestos/Control Guidance Manual'; and

"c. It should be noted that covering the ceilings with paint or other acceptable sealants will effectively seal the asbestos fibers in place. However, these coatings will tend to seal the voids in the ceiling, which may reduce the acoustic level. If this should happen, there are a number of things that can be done to regain the acoustic level lost to the sealants.

"6. Any work that might generate dust or fibers should not be done when students, faculty, or staff are present." (Emphasis added.)

In June 1980, after receiving Kos' report, Beavercreek expended funds to encapsulate the asbestos-containing material in its schools. Approximate costs to Beavercreek included $9,461.56 for labor and $5,671 for paint. This preventative measure was taken in response to air sampling tests by the Ohio Department of Health and recommendation of Kos to encapsulate the ceilings with paint to contain the asbestos fibers after test results revealed that the asbestos fiber count was low.

At this point, Beavercreek was on notice that asbestos was in the schools and that exposure to asbestos presented possible health risks. Beavercreek investigated the problem and took remedial measures at a cost of approxi-

mately $15,000, in order to prevent risk of asbestos contamination of which it is now complaining.

These facts are sufficient to establish that Beavercreek knew or should have known that it had been injured by the conduct of Basic, of which Beavercreek now complains. Therefore, we conclude that Beavercreek's cause of action accrued in June 1980 when the ceilings of two schools were painted.

The documentary evidence before the trial court, when construed most strongly in Beavercreek's favor, establishes that Beavercreek was aware of the alleged health risks associated with asbestos, received reports and recommendations from a state health agency regarding the asbestos in its schools, and expended funds to maintain the asbestos material in the schools in accordance with state recommendations more than four years before August 21, 1985, the date that Beavercreek filed its original complaint. When the evidence submitted by both parties is viewed in a light most favorable to Beavercreek, reasonable minds can come to but one conclusion as to the date of accrual of this cause of action, and that conclusion is adverse to Beavercreek. Therefore, we conclude that the trial court erred in denying Basic's motion for summary judgment.

Beavercreek contends that its cause of action did not accrue until it knew or had reason to know of the "extent and seriousness of its condition."

Relying upon the case of *Hershberger v. Akron City Hosp.* (1987), 34 Ohio St.3d 1, 516 N.E.2d 204, Beavercreek contends that it was permitted to wait before bringing action against Basic until the extent and seriousness of its condition became apparent. *Hershberger* is a case involving a medical malpractice action and the determination of the accrual date in applying the statute of limitations under R.C. 2305.11(A).

A more recent Supreme Court case has applied and interpreted the proposition of law set out in *Hershberger* and explained the meaning of the terms, "extent and seriousness of his condition," found in the first prong of *Hershberger*. *Allenius v. Thomas* (1989), 42 Ohio St.3d 131, 133, 538 N.E.2d 93, 95. The *Allenius* decision held that the "extent and seriousness of his condition" language in *Hershberger* "requires that there be an occurrence of a 'cognizable event' which does or should lead the patient to believe that the condition of which the patient complains is related to a medical procedure, treatment or diagnosis previously rendered to the patient and where the cognizable event does or should place the patient on notice of the need to pursue his possible remedies." *Allenius, supra,* syllabus. The court further stated that it is not necessary that a "patient must be aware of the *full* extent of the injury before there is a cognizable event." *Id.* at 133–134, 538 N.E.2d at 96. The

only requirement is a cognizable event which does or should alert a person that an improper medical procedure, treatment or diagnosis has taken place.

The case before us is predicated upon a theory of strict liability in tort. The statute of limitations relied upon by the parties is R.C. 2305.09(D), rather than R.C. 2305.11(A), which was discussed in *Hershberger.* Furthermore, we do not interpret *Hershberger* to stand for the proposition that a cause of action does not accrue until a party knows or has reason to know of the extent and seriousness of his injury, as urged by Beavercreek.

██ When a cause of action has accrued, the running of the statute of limitations is not tolled by the fact that the plaintiff cannot ascertain the amount of his damage. *Archer v. Huntington National Bank* (1952), 92 Ohio App. 229, 49 O.O. 335, 109 N.E.2d 677, paragraph one of the syllabus. The Supreme Court of the United States in *Wilcox v. Exrs. of Plummer* (1830), 29 U.S. (4 Pet.) 172, 7 L.Ed. 821, has stated "that proof of actual damage may extend to facts that occur and grow out of injury, even up to the date of the verdict. If so, it is clear that the damage is not the cause of the action." *Id.* at paragraph five of the headnotes. It is unnecessary that the full extent of damages be ascertainable and it is immaterial that additional damages may occur subsequently when determining the accrual date of a cause of action for statute of limitations purposes. We conclude that an accrual of a cause of action is not delayed until the full extent of the resulting damage is known.

██ Beavercreek contends that the statute of limitations was tolled by the filing of a class action in the United States District Court for the Eastern District of Pennsylvania, and that the running of the statute of limitations was tolled until Beavercreek exercised its right to opt out of the class of plaintiffs.

██ The commencement of a class action tolls the statute of limitations as to all asserted members of the class until the class member exercises his right to opt out because, before this time, the class member is deemed to be actively prosecuting his rights. However, the statute of limitations continues to run as to a potential defendant who is not named as a defendant in the class suit because a nondefendant lacks notice of the assertion of claims against him. *Arneil v. Ramsey* (C.A.2, 1977), 550 F.2d 774; *Cullen v. Margiotta* (C.A.2, 1987), 811 F.2d 698.

██ Fed.R.Civ.P. 15(c) is applicable for purposes of determining whether an amended complaint should be deemed to relate back to the filing of the original complaint. The purpose behind Rule 15(c) is to "ameliorate the effect of a statute of limitations where the plaintiff has sued the wrong party but

where the right party has had adequate notice of the action." *Jenkins v. Carruth* (E.D.Tenn.1982), 583 F.Supp. 613, 615, quoting *Bloomfield Mech. Contracting, Inc. v. Occupational Safety & Health Rev. Comm.* (C.A.3, 1975), 519 F.2d 1257, 1262.

Pursuant to Fed.R.Civ.P. 15(c), an amended complaint changing a party to the action will only relate back if all three conditions in the rule for doing so have been met. The conditions are as follows:

"1. The pleading as amended must relate to the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading;

"2. Plaintiff must show that within the period provided by law for commencing the action against him, the party to be brought in by amendment has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and

"3. Defendant knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him." *Varlack v. SWC Caribbean, Inc.* (C.A.3, 1977), 550 F.2d 171; *Jenkins v. Carruth, supra.*

The general proposition regarding relation back of amendments states that an amendment to a complaint which adds a new party creates a new cause of action and will not relate back to the date of filing the original complaint for statute of limitations purposes. *Smart v. Ellis Trucking Co., Inc.* (C.A.6, 1978), 580 F.2d 215, 218, certiorari denied (1979), 440 U.S. 958, 99 S.Ct. 1497, 59 L.Ed.2d 770; *Marlowe v. Fisher Body* (C.A.6, 1973), 489 F.2d 1057, 1064; *Jenkins v. Carruth, supra.* An amendment will relate back only with respect to matters relating to the original parties to the complaint, or to correct a misnomer or a misdescription of a party, but not to add or to substitute a new party defendant. *United States v. Western Cas. & Sur. Co.* (C.A.6, 1966), 359 F.2d 521, 523; *Jenkins, supra,* 583 F.Supp. at 615, 616.

A mistake of party does not exist merely because a "party who may be liable for conduct alleged in the original complaint was omitted as a party defendant." *Jenkins, supra,* at 616, citing *Francis v. Pan American Trinidad Oil Co.* (D.C.Del.1975), 392 F.Supp. 1252, 1259. However, it has been held that the relationship between parent and wholly owned subsidiary creates an inference based upon facts in the record that service on the parent was notice to the subsidiary for purposes of determining whether there has been prejudice to the defendant as an element of the defense of laches. *Lasseigne v. Nigerian Gulf Oil Co.* (D.Del.1975), 397 F.Supp. 465. In *Lasseigne,* the court determined that the facts indicated that the defendant knew of the action and knew that the action would have been directed against him, but for

plaintiff's mistake, and that he should have been prepared to litigate the case as if he had been served during the statutory period. The trial court found that the issue of prejudice was one that remained to be tried, and, therefore, denied summary judgment on the basis of laches.

In the case before us, Beavercreek has raised an issue as to whether the amended class action complaint filed on December 15, 1986, adding Basic as a defendant, relates back to the original complaint filed on January 17, 1983. If the amended complaint is found to relate back, then the statute of limitations was tolled by the filing of the class action in 1983.

In support of its motion for summary judgment, Basic filed evidentiary material within the scope of Civ.R. 56(C) that, if not contradicted or rebutted, established its right to judgment in its favor based upon the statute of limitations defense. There were no allegations in Beavercreek's pleadings with respect to the tolling of the statute of limitations during the pendency of a class action.

In order to avoid the apparent bar of the statute of limitations, Beavercreek, in its memorandum in opposition to Basic's motion, sought to establish that the statute of limitations was tolled during the pendency of a class action. Since this was not alleged in Beavercreek's pleading, Beavercreek had the burden of establishing that this involved a genuine issue of material fact. Beavercreek was required to satisfy this burden by presenting evidentiary material within the scope of Civ.R. 56(E) that would support its tolling argument.

The evidence before the court in this case establishes that Basic is a wholly-owned subsidiary of Combustion Engineering, that the same attorneys have represented the two entities, and that the amended pleading relates to the same conduct set forth in the original pleading. However, Beavercreek failed to present any evidence, pursuant to Civ.R. 56(C), that its failure to name Basic as a party defendant in the federal class action was the result of a mistake on Beavercreek's part, i.e., that Beavercreek actually had intended to name Basic, but failed to do so as a result of a mistake. This is an essential element for the amended complaint naming Basic in the federal class action to relate back to the filing of the original complaint in that case. Without the relation back, Beavercreek's attempt to avoid the bar of the statute of limitations fails.

Thus, Basic succeeded in establishing that there was no genuine issue of material fact concerning the statute of limitations defense, and Beavercreek failed to establish that there was a genuine issue of material fact.

Beavercreek contends that Basic waived its statute of limitations defense at trial by pleading the defense and then presenting an inconsistent theory at

trial. Beavercreek does not cite any Ohio case law standing for this proposition. Furthermore, this contention is not raised in consideration of the merits of the motion for summary judgment.

We have held that failure to grant a meritorious motion for summary judgment is prejudicial error which is not cured by providing to the defendant the opportunity to litigate the issues at trial. "To hold otherwise would render [a] meritorious motion a nullity." *Rawers v. Clark* (July 21, 1987), Montgomery App. No. 10209, unreported, 1987 WL 15016.

The trial court erred when it failed to grant Basic's motion for summary judgment based upon the statute of limitations defense.

Basic's first assignment of error is sustained.

## VII

Basic's second assignment of error is as follows:

"The trial court erred in instructing the jury to apply both the consumer expectation test and the risk-utility test to determine whether Basic incorporate's [*sic*] plaster was defective."

▮ Beavercreek initially contends that Basic waived its right to assign as error the trial court's jury charge when it failed to state the grounds of its objection to the trial court. The colloquy ensuing between Basic and the trial court was as follows:

"THE COURT: Gentlemen of Counsel, would you like to step up? All right. Let the record indicate that prior to the Court's closing comment, Counsel was invited to the Bench to make any suggestion to the Court which they wished concerning the charge. Mr. Patterson, for the Defense, indicated that he had some observations, some exceptions to take to the Court's charge, and it was agreed at the time we would continue and that these exceptions would be retroactively inserted at the appropriate time at that point in time in the record, so to reflect that the exceptions were timely brought.

"MR. PATTERSON: As we discussed yesterday, I do object to the consumer expectation charge, and obviously it was given by the Court."

Civ.R. 51(A) requires a party to state specifically the matter to which he objects and the grounds of his objection in order to provide the trial court with an opportunity to correct its error.

The specific reason for the objection to the consumer expectation test is not stated in the transcript; however, the transcript does refer to an off-the-record discussion between the parties and the trial court regarding the jury charge. From the record, it appears the trial court was fully aware of Basic's

objection to the charge given and had adequate opportunity to reconsider the charge. Therefore, we will consider Basic's second assignment of error.

 Basic contends that the trial court's charge to the jury instructing the jury to apply both the consumer expectation test and the risk-utility test was error under Ohio law because the tests are alternative choices and this case involves a non-consumer product.

 The test for determining whether a product design is defective is characterized as a two-pronged test as follows:

"A product design is in a defective condition if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or if the benefits of the challenged design do not outweigh the risk inherent in such design." *Knitz v. Minster Machine Co.* (1982), 69 Ohio St.2d 460, 23 O.O.3d 403, 432 N.E.2d 814, syllabus, *Leichtamer v. American Motors Corp.* (1981), 67 Ohio St.2d 456, 21 O.O.3d 285, 424 N.E.2d 568, approved and followed; *Cremeans v. Internatl. Harvester* (1983), 6 Ohio St.3d 232, 6 OBR 302, 452 N.E.2d 1281. The test contemplates application of both the consumer expectation analysis and the risk-utility analysis in determining whether the product design is in a defective condition to the user or consumer. The two-pronged analysis of the test does not mean that the consumer expectation and risk-utility analyses are mutually exclusive. To the contrary, if the jury concludes that one standard is not met, the jury may consider the other standard. We conclude that it was proper for the trial court to instruct the jury regarding both prongs of the test for determining whether a product design is defective. Basic's second assignment of error is overruled.

## VIII

Basic's first assignment of error having been sustained, the judgment of the trial court is reversed, and, pursuant to App.R. 12(B), judgment is entered in favor of Basic and against Beavercreek.

*Judgment reversed.*

WILSON and WOLFF, JJ., concur.