DECISION.
{¶ 1} In 1998, plaintiffs-appellants Elizabeth and Daniel Knowles bought a nine-year-old house that turned out to have extensive water damage allegedly due to defective construction and installation of the windows and the exterior cladding. In May 2002, the Knowles sued the general contractor and the subcontractors that built the house.
 {¶ 2} The trial court granted summary judgment in favor of defendantsappellees Mercurio Homes, Inc., Mark Mercurio, Sto Corp., and Caradco, Inc., and third-party defendant-appellee American Services Co. The trial court held that the Knowleses' claims were time-barred by the four-year statute of limitations on actions for damages to real property.
 {¶ 3} Because the determination of whether the Knowleses' claim was timebarred involved, in part, a factual determination, we hold that the grant of summary judgment was improper. We reverse and remand to the trial court for a factual determination of when either the Knowles or the previous owners had discovered or should have discovered the damages to the house.
 I. Problems with the House {¶ 4} The Knowleses were the third owners of the house at 3646 Carpenter Green Lane. The Ketchums purchased the house from the general contractor, Mercurio Custom Homes, Inc., in 1989. They lived in it for seven years. In 1996, the Bindas bought it from the Ketchums. The Knowles then bought it from the Bindas in 1998.
 {¶ 5} When the house was built, the exterior was clad with a synthetic stucco-like product known as an exterior insulative finish system (EIFS). Sto manufactured the EIFS. Caradco manufactured the windows that were originally installed in the house. American Services was the subcontractor that installed all the original roofing and plaster on the house.
 {¶ 6} Pamela Ketchum testified in her deposition that the windowsills at the front of the house were painted on three separate occasions during the time that she and her husband owned the house. In 1990, the paint on the front windowsills began peeling. Mercurio repainted them. Ketchum testified that she was "disappointed in the quality of the paint on the windowsill at that time," but she attributed the peeling paint to normal weather-related wear.
 {¶ 7} Ketchum further testified that the paint on the front windows began peeling again. She hired a painter to paint all the windows of the house. She again assumed the paint was peeling because "[t]he sills on the front were highly vulnerable to the weather." In addition, Ketchum testified that she and her husband had the windowsills repainted close to the time they sold the house. But, at that time, there was nothing wrong with the paint on the sills.
 {¶ 8} Ketchum also testified that there was a small crack or stress bulge in the EIFS when they sold the house to the Bindas. The Ketchums disclosed the crack to the Bindas, and the Bindas' home-inspection report noted the crack.
 {¶ 9} Doris Binda testified that, shortly after moving in, she noticed ants in her bedroom. She called an exterminator, who told her that the bedroom window and the window below it had dry rot.
 {¶ 10} The Bindas hired Dan Russell to inspect all the windows and to repair the ones with rotted wood. Doris Binda testified that Russell told her that he had resloped the repaired windowsills to help water run off them better. This was apparently a miscommunication, because Russell testified that he had not resloped the windowsills.
 {¶ 11} Russell testified that, in the fall of 1997, he repaired five windows on the front of the Bindas' house where the wood had rotted. According to Russell, the windowsills did not look rotted because the paint on them was still intact. But once he probed the sills, he discovered rotted wood underneath the paint. He testified that the rot did not go all the way through the sills. He removed the rotted parts and filled them in with epoxy material. He then caulked and repainted the sills.
 {¶ 12} Russell checked other windows throughout the house, but found that most of the damage was on the front windows. Russell stated that he assumed that most of the rot was in the front windows because snow would not thaw out as quickly there as in other areas.
 {¶ 13} At his deposition, Russell was asked how the decay could have occurred under the paint without the paint being affected. He admitted that water must have been getting in other than through the painted surface. He said that he thought the water infiltration was not heavy, but more like a seepage that had occurred over three or four years. Yet Russell repeatedly testified that, at the time, he believed the damage was caused by unmelted snow resting on the sills. He also said that that was what he probably told the Bindas.
 {¶ 14} Russell also replaced rotten wood on the top of French doors at the back of the house. Russell testified that he was not sure why the wood had rotted on the doors, but speculated that water had come down the outside of the house and wicked underneath an area of the EIFS. But he stated, "I never thought — I didn't think at that time the EIFS had anything to do with any of the problem, tell you the truth, because nothing showed me on the EIFS that [it]was bad." Russell admitted that he never investigated the EIFS. After Russell made his repairs, he told the Bindas that the areas he had worked on would not require any further work.
 {¶ 15} When the Bindas sold the house, they wrote on the disclosure form, "[W]e had one instance of ants in one windowsill — treated immediately — repaired to excellent condition — no further or existing problems." Further down on the form, they wrote, "[W]indowsills in front windows repaired and resloped for proper run off."
 {¶ 16} At her deposition, Doris Binda was asked why she did not reveal on the disclosure form that wood had rotted in the windowsills. She replied that it was not necessary to mention it. Binda said that she believed the wood had rotted as a natural result of weathering. She stated, "We have this done all the time in our homes when our — you know, if there's any problem with wood. It's — Especially if you're facing west, you're going to have to have, you know, your windows done all the time. * * * And so that, to me, is even a home improvement. * * * It's not a problem when you have a — you know, when you have fixed your wood rot, which happens in every single person's house."
 {¶ 17} Elizabeth Knowles testified that she and her husband signed the purchase contract for the house in April 1998 and closed on it in June 1998. She testified that they did not speak directly with the Bindas prior to the closing. According to Knowles, a real estate agent told them that the Bindas had had to replace the windowsills on the south side of the house and that "the sills were not sloped properly so water was sitting on the sills and rotting the wood." She further testified, "I believe that there was moisture that got underneath the sills, so I think that they had problems with it."
 {¶ 18} The Knowleses had a home inspection done before buying the house. The inspector reported that "[t]here were no major defects observed to the windows or doors at the time of the inspection."
 {¶ 19} The report also noted that the exterior cladding material of the house consisted of synthetic stucco. The report stated, "A complete evaluation of the synthetic stucco, and the possibility of latent moisture problems, is not within the scope of this inspection. A complete evaluation of the synthetic stucco siding would require the services of a qualified contractor in this field. It is advised that you contact the builder or the synthetic stucco contractor and discuss this product with them. The exterior cladding/siding and trim was observed to be in serviceable condition at the time of the inspection."
 {¶ 20} In an affidavit, Elizabeth Knowles stated that the inspector had told her "that he had heard of the issue of moisture behind the EIFS, but that this had occurred only in the deep south where there was very high humidity." She stated that the inspector had informed her that the EIFS had been used extensively in the Cincinnati area, yet he had never heard of any moisture problems behind the EIFS surface in the area. The Knowleses did not hire any other inspectors before buying the house.
 {¶ 21} In the winter of 2000/2001, Elizabeth Knowles noticed peeling paint on the front and back windowsills. Knowles contacted a painter for an estimate for repainting the windows. The painter informed her that she should first contact a carpenter to replace some rotted wood. The first carpenter Knowles contacted told her that he did not want the job of fixing the rotted wood, because he was afraid of what he was going to find underneath the windowsills.
 {¶ 22} Knowles became quite concerned and contacted the home inspector. The inspector pointed out missing flashing on the roof and cracks in the synthetic stucco. The inspector also recommended that Knowles contact Steve Bostwick.
 {¶ 23} The Knowles eventually hired Bostwick, an architect who specialized in forensic architectural investigation and remediation. Bostwick inspected the house in July 2001. He found widespread moisture intrusion behind the EIFS, in addition to numerous building-code violations. He recommended complete removal of the EIFS, installation of new flashing on the roof, and replacement or reinstallation of the windows with code-required sill flashing.
 {¶ 24} The Knowleses followed Bostwick's recommendations. In 2002, the EIFS was completely removed and new windows were installed in the house. All the recommended flashing was installed. The removal of the EIFS revealed numerous areas of rotten plywood not adjacent to or below any windows.
 II. Statute of Limitations {¶ 25} In their single assignment of error, the Knowleses argue that the trial court erred when it dismissed their claims. We review a grant of summary judgment de novo.[1] Mercurio Homes, Inc., Mark Mercurio, Sto Corp., Caradco, Inc., and American Services Co. were entitled to prevail on their summary-judgment motions only if (1) there was no genuine issue of material fact; (2) they were entitled to judgment as a matter of law; and (3) it appeared that reasonable minds could come to but one conclusion when viewing the evidence in favor of the party opposing the motion, and that conclusion was adverse to the party opposing the motion.[2]
 {¶ 26} All the builders make the same argument. They claim that the statute of limitations had run before the Knowleses filed their suit.
 {¶ 27} Claims against a builder of a completed residence for damages caused by negligent construction must be brought within four years after the damages have occurred.[3] In Harris v. Liston, the Ohio Supreme Court held that the four-year statute of limitations begins to run when damage to the property is "first discovered, or through the exercise of reasonable diligence it should have been discovered."[4]
 {¶ 28} In Harris, the Listons had purchased a lot and built a house on it. As soon as the Listons moved into the house, they became aware of a "water situation." Despite attempts to alleviate the water problem, at certain times of the year, there was standing water on the property. Seven years later, the Listons sold the house to the Harrises. The Harrises immediately noticed the water problem and numerous other problems with the house. They eventually sued the Listons, along with the Jackson Road Company, which had owned the undeveloped land during the time the sewer and water mains were constructed.
 {¶ 29} The court adopted the discovery rule for negligent-construction claims. The court then held that because the Listons knew of the problems as soon as they moved in, the problems were "discovered" eight years before the Harrises' suit. Thus, the suit against Jackson was time-barred by the statute of limitations.
 {¶ 30} The court went on to note that had the Harrises been fully informed of the problems, "they most likely would not have purchased the home or they might have negotiated a price that reflected the problems." The court continued, "Of course, if the Listons had not been aware of the problems associated with the property, and [the Harrises] thereafter purchased the home, [the Harrises'] negligence claims against Jackson would not have accrued, in accordance with R.C. 2305.09(D), until [the Harrises] actually discovered, or through the exercise of reasonable diligence should have discovered, the damage to the property."[5]
 {¶ 31} Thus, the statute of limitations begins to run at the time thatany owner of a house learns, or should have learned, of a problem with the house. In the Knowleses' case, to determine when the statute of limitations began running, it must be ascertained at what point in time any owner of the house knew, or should have known, that there was a problem with the EIFS.
 {¶ 32} The application of a statute of limitations presents a mixed question of law and fact.[6] Determination of when a plaintiff's cause of action accrues is ordinarily to be decided by the factfinder.[7] The application of the statute of limitations to the factual determination is then an issue of law to be decided by the trial court.[8] As an analogy, in medical malpractice cases, which are subject to a similar discovery rule regarding the plaintiff's injury, the jury can be instructed to answer interrogatories to determine the "cognizable event" that triggers the running of the statute.[9]
 {¶ 33} We conclude that, in this case, the determination of when any of the owners of the house knew, or through the exercise of reasonable diligence should have known, that there was a problem with the EIFS was a question of fact for a jury. Therefore, with a genuine issue of material fact remaining, the grant of summary judgment was improper.
 {¶ 34} In this case, the specific question of fact to be determined is whether the knowledge of the Ketchums, Bindas, or Knowleses sufficiently alerted them, or should have alerted them, to further investigate and discover the structural damage being done by water intruding through the EIFS and the windows.
 {¶ 35} The defendants argue that it is clear that the Bindas and even the Ketchums "discovered" the water damage to the house while they lived in it. They cite Pamela Ketchum's testimony that she had the windows on the house repainted several times because the paint was peeling. They also cite Doris Binda's testimony that she discovered rotted wood in the windows. According to the defendants, these problems, discovered by both the Ketchums and the Bindas, were the same problems created by the faulty EIFS and windows that formed the basis for the Knowleses' suit.
 {¶ 36} The Knowleses counter that knowledge of peeling paint and rotten wood in the windowsills was not knowledge of the extensive water damage to the structure of the house ultimately caused by the faulty EIFS and windows. They argue that they were told, as the Bindas believed, that any problems with the windows had been fixed and would not occur again.
 {¶ 37} The trial court considered the Knowleses' argument to reflect merely a dispute about whether the previous owners had discovered the problem or part of the problem. The trial court determined that this distinction did not matter, citing Jones v. Hughey.[10] In Jones, the court stated, "Ohio courts have held that it is `unnecessary that the full extent of damages be ascertainable' in determining the accrual date of a cause of action for statute of limitations purposes. * * * Thus, `an accrual of a cause of action is not delayed until the full extent of the resulting damage is known.'"[11]
 {¶ 38} But it is a question of fact whether the knowledge of the Ketchums and the Bindas that paint was peeling and wood was rotting in the windowsills meant that they had discovered — to any extent — the fundamental problems with the house.
 {¶ 39} The defendants further argue that, at the least, the homeowners should have, through the exercise of reasonable diligence, discovered the problems. The Ohio Supreme Court has defined reasonable diligence as a "fair, proper, and due degree of care and activity, measured with reference to the particular circumstances; such diligence, care, or attention as might be expected from a man of ordinary prudence and activity."[12] The court emphasized, "[W]hat constitutes reasonable diligence will depend on the facts and circumstances of each particular case."[13]
 {¶ 40} Under the facts and circumstances of this case, it is not a clear issue of law what a homeowner of ordinary prudence would have done when faced with peeling paint and rotting windows, or whether these problems would have suggested the extensive problems caused by the allegedly defective EIFS. It is a question of fact.
 {¶ 41} Because questions of fact remain, we sustain the Knowleses' assignment of error. We reverse the entry of summary judgment and remand this case to the trial court for further proceedings according to law.
Judgment reversed and cause remanded.
Hildebrandt, P.J., and Sundermann, J., concur.
[1] See Doe v. Shaffer, 90 Ohio St.3d 388, 390, 2000-Ohio-186,738 N.E.2d 1243.
[2] See Grafton v. Ohio Edison Co., 77 Ohio St.3d 102, 105,1996-Ohio-336, 671 N.E.2d 241.
[3] R.C. 2305.09(D); Velotta v. Leo Petronzio Landscaping, Inc.
(1982), 69 Ohio St.2d 376, 433 N.E.2d 147, paragraph one of the syllabus.
[4] See Harris v. Liston, 86 Ohio St.3d 203, 207, 1999-Ohio-159,714 N.E.2d 377.
[5] See id. at 208.
[6] See Cyrus v. Henes (1993), 89 Ohio App.3d 172, 175,623 N.E.2d 1256.
[7] Id.
[8] See Luft v. Perry County Lumber Supply Co. (May 8, 2003), 10th Dist. No. 02AP-559.
[9] See Pesek v. University Neurologists Assn., 87 Ohio St.3d 495,2000-Ohio-483, 721 N.E.2d 1011.
[10] See Jones v. Hughey, 153 Ohio App.3d 314, 2003-Ohio-3184,794 N.E.2d 79.
[11] See id. at ¶ 28, quoting Beavercreek Local Schools v. Basic,Inc. (1991), 71 Ohio App.3d 669, 689, 595 N.E.2d 360, and Zeppernickv. PNC Bank Natl. Assn. (Aug. 22, 2000), 7th Dist. No. 99 CA 7.
[12] See Sizemore v. Smith (1983), 6 Ohio St.3d 330, 332,453 N.E.2d 632.
[13] Id.