COURTNEY, Exr., Appellant,

v.

TAYLOR et al., Appellees.

[Cite as *Courtney v. Taylor* (1998), 125 Ohio App.3d 487.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–970034.

Decided Jan. 30, 1998.

488

*Thomas C. Korbee,* for appellant.

*Philip J. Marsick,* for appellees Sally Taylor, M.D., Kurt Knochel, M.D., and Qualified Emergency Specialists, Inc.

*Michael F. Lyon,* for appellees Louis Brockmeier, M.D., and Northwest Cardiology, Inc.

---

MARIANNA BROWN BETTMAN, Judge.

This is an appeal from a judgment entered on the jury's verdict in favor of the defendants in a medical malpractice action arising from the patient's death. The plaintiff below and appellant in this appeal is Don Courtney, as executor of his wife Carolyn's estate. Defendants below and appellees in this appeal are Drs. Sally Taylor, Kurt Knochel, and Louis Brockmeier, Qualified Emergency Specialists, Inc. (Knochel's employer), and Northwest Cardiology, Inc. (Brockmeier's employer).

## FACTS

On August 3, 1992, Carolyn Courtney saw her family doctor, Sally Taylor, M.D., for a very painful inflammation of both lower legs, the right acutely so. According to the history taken by Taylor, Mrs. Courtney's right leg had begun swelling after a walk of several miles over several hours. Taylor made the diagnosis of erythema nodosum, an inflammatory process characterized by red and painful spots on the legs. For this Taylor prescribed heat, elevation of the right leg, and Naprosyn. Taylor ruled out deep vein thrombosis as a diagnosis, thrombosis being the formation or development of blood clots.

On August 7, Mrs. Courtney fainted at home and was brought to the emergency room of Providence Hospital, shortly before noon. She was examined by Knochel, the emergency room doctor. Although he spoke with Taylor by telephone, Taylor did not tell him the history of the earlier right leg problem.

Over the next four hours, Knochel ordered a series of tests, including a CT scan of the head, a chest x-ray, blood work, blood-pressure monitoring, and two EKGs. The CT scan, chest x-ray, and first EKG were normal. However, Mrs. Courtney's blood pressure was falling despite intravenous fluids, her clotting time was abnormal, and her heart rate was episodically very slow. The second EKG showed several abnormalities, particularly on the right side. There were also several episodes where Mrs. Courtney was gasping for breath and coming in and out of consciousness.

At 3:10 p.m., Knochel called for a cardiology consultation for Mrs. Courtney. Brockmeier, the cardiologist, arrived at 4:40 p.m. Brockmeier examined Mrs. Courtney and observed what he thought to be seizures. Believing that this was a neurology problem, he requested a consultation from neurologist Dr. Karen Thallinger. Brockmeier never saw the second EKG and testified that he was unaware that there was one. Brockmeier left the hospital at 5:00 p.m. to attend a tennis tournament. He believed that Thallinger was in charge of the patient when he left. But he also testified that he thought the patient was to be admitted on his service. Thallinger, who arrived at 5:15 p.m., performed a neurologic examination and concluded that Mrs. Courtney's problems were not neurological.

Knochel telephoned Brockmeier at the tennis match at 6:38 p.m. and informed him that Mrs. Courtney was doing very poorly and that he needed to return to the hospital. Brockmeier said he would return. After about half an hour, Thallinger had Knochel place a second call to Brockmeier. Mrs. Courtney died shortly after 8:00 p.m. Brockmeier did not return to the hospital until after her death. An autopsy showed that Mrs. Courtney died from a pulmonary embolism, a diagnosis that no doctor made before she died.

The issues in this case at trial were whether it was below the standard of care to fail to diagnose Mrs. Courtney's pulmonary embolism, and whether, if that diagnosis had been made, Mrs. Courtney would probably have survived. Taylor was faulted by the plaintiff for failing to diagnose deep veinous thrombosis on Mrs. Courtney's August 3 visit and for failing to communicate the earlier leg-swelling problem to Knochel, which, the plaintiff alleged, would have assisted Knochel in diagnosing the pulmonary embolism. Knochel was faulted by the plaintiff for failing to make the correct diagnosis, as was Brockmeier. Additionally, a claim for punitive damages was made against Brockmeier for his actions in regard to Mrs. Courtney on the day she died. After hearing all the evidence, the jury returned a verdict in favor of all defendants.

## ASSIGNMENTS OF ERROR

In his first assignment of error, Mr. Courtney alleges that the trial court erred in permitting defense counsel to read from medical journal articles during cross-examination of plaintiff's experts. We agree.

Defense counsel first attempted to cross-examine Dr. Nash, plaintiff's expert cardiologist, about an article authored by a Sam Goldhaber entitled "Facts Associated with Correct Ante–Mortem Diagnosis of Major Pulmonary Embolism," which discussed the difficulty of diagnosing pulmonary embolism before death. Nash acknowledged that Goldhaber is an expert and authority on

pulmonary embolism, and that he had read some of Goldhaber's articles, although not the one about which defense counsel was questioning him.

Defense counsel also attempted to cross-examine Dr. Niemann, plaintiff's expert in emergency medicine, about the same article. Niemann agreed that Goldhaber is an expert in pulmonary embolism, that he had in fact listed this particular Goldhaber article in the bibliography of a textbook chapter he had coauthored, but that he did not recall if he had read it.

Defense counsel proceeded to quote extensively from the article to the jury in questioning Nash and, to a lesser extent, Niemann. This was error for two reasons.

Paragraph two of the syllabus of *Stinson v. England*[1] reads as follows:

"The learned treatise exception to the hearsay rule set forth in Fed.Evid.R. 803(18) has no counterpart in Ohio Evid.R. 803. In Ohio, a learned treatise may be used for impeachment purposes to demonstrate that an expert is either unaware of the text or unfamiliar with its contents. Moreover, the substance of the treatise may be employed only to impeach the credibility of an expert who has relied upon the treatise * * * [citations omitted] or has acknowledged its authoritative nature."

Ohio law is clear that authoritative textbooks and other learned treatises are explicitly limited to impeachment and may not be used as substantive evidence.[2] The pertinent reasons for this are the lack of certainty as to the validity of the opinions and conclusions set forth and an inability to cross-examine the author.[3] But this rule is not without its problems. Sophisticated experts can avoid rigorous cross-examination simply by refusing to acknowledge any work as authoritative, a common ploy by experts for both plaintiffs and defendants in malpractice cases. One court has suggested that if a medical witness refuses to recognize a medical treatise as authoritative, the cross-examining party may prove the authoritativeness "either through judicial notice or through the testimony of another medical witness."[4]

---

**1.** (1994), 69 Ohio St.3d 451, 633 N.E.2d 532.

**2.** *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 110, 592 N.E.2d 828, 838; *Hallworth v. Republic Steel Corp.* (1950), 153 Ohio St. 349, 354, 41 O.O. 341, 343, 91 N.E.2d 690, 693.

**3.** *Piotrowski v. Corey Hosp.* (1961), 172 Ohio St. 61, 69, 15 O.O.2d 126, 130, 173 N.E.2d 355, 360; *Beavercreek Local Schools v. Basic, Inc.* (1991), 71 Ohio App.3d 669, 595 N.E.2d 360.

**4.** *Williams v. O'Brien* (Nov. 25, 1992), Montgomery App. No. 12344, unreported, 1992 WL 348218, affirmed in *Williams v. O'Brien* (1995), 72 Ohio St.3d 288, 649 N.E.2d 831, citing *Stinson v. England, supra.*

 Against this backdrop, we examine the questioning of Nash and Niemann about the Goldhaber article. Nash did acknowledge Dr. Goldhaber as an expert in the field of pulmonary embolism, but he was not familiar with the particular article used to question him. As for Niemann, we agree with the trial court that because the Goldhaber article was in a textbook chapter Niemann coauthored, he could be impeached with the article. The problem is that while both experts acknowledged Goldhaber as an expert, the article was *not* used to impeach any of Nash's or Niemann's testimony. Instead, the article was used as a backhanded piece of substantive evidence, quoted to the jury in direct contravention of *Stinson v. England, Ramage v. Cent. Ohio Emergency Serv.*, Ohio's hearsay rule, and paragraph two of the syllabus of *Hallworth, supra*, which reads:

"Medical books or treatises, even though properly identified and authenticated and shown to be recognized as standard authorities on the subjects to which they relate, are not admissible in evidence to prove the truth of the statements therein contained."

By permitting this type of questioning, the defense was given a "free shot," meaning a phantom expert witness, acknowledged as an authority on pulmonary embolism, whose "testimony" (read through his article) was that, statistically, pulmonary embolism is missed most of the time and usually only correctly diagnosed on autopsy. Therefore, the jury could conclude that it was normal to miss this diagnosis and, correspondingly, if the defendants missed it, it was not malpractice.

Thus, Goldhaber, an acknowledged "expert" on the very subject of the lawsuit, was permitted to testify, without being present and without being cross-examined, precisely the reasons why Ohio chose not to adopt a counterpart to Fed.Evid.R. 803(18), the federal learned-treatise exception to the hearsay rule. To further compound this error, and to underscore its prejudicial nature, defense counsel several times interposed his own interpretation of the Goldhaber article and asked Nash if he agreed both with the article and counsel's interpretation of it. Finally, in his closing argument, defense counsel referred to Goldhaber, "who you heard time and again in this courtroom," to bolster his position. We conclude that because this line of questioning went directly to the core issue in this lawsuit, whether failure to diagnose and timely treat Mrs. Courtney's pulmonary embolism constituted a deviation from the standard of care, the error was prejudicial. The first assignment of error is sustained.

In his second assignment of error, Mr. Courtney argues that the trial court erred in excluding certain testimony of Thallinger that was critical of Brockmeier's care of Mrs. Courtney. The excluded testimony was properly proffered for our review.

Thallinger was the neurologist called by Brockmeier to see Mrs. Courtney when Brockmeier became convinced that the patient had a neurological problem. She also instituted the second telephone call to Brockmeier at the tennis match, requesting his immediate return to the hospital.

Thallinger testified at trial by deposition. The testimony excluded by the court was that Thallinger was upset with Brockmeier. The trial court correctly excluded as nonresponsive several general answers given by Thallinger about being upset. However, the following question and answer were improperly stricken:

"Q: Well, you said you were upset. What were you upset about other than the fact that he didn't come back to tend to the patient?

"A: Well, I mean to me that's sufficient. The fact that he wasn't taking this seriously, her steady deterioration over the afternoon and early evening."

The testimony of a treating physician is by no means limited to the requirements for expert testimony set forth in the syllabus of *Bruni v. Tatsumi*.[5] This is too strict a limitation on observations of a fellow treating physician.[6] This is especially so where, as here, there was a team of physicians treating the same patient, none of whom the patient selected. Additionally, it was unclear who was in charge of the patient when Brockmeier left for the tennis match, under the belief that Mrs. Courtney was to be admitted to the hospital on his service. Thallinger determined that the problem was not a neurological one, and neither the emergency room physician nor Mrs. Courtney's family doctor had admitting privileges at Providence Hospital. This assignment of error is sustained in part.

In the third and final assignment of error, Mr. Courtney argues that the trial court erred in granting Brockmeier a directed verdict on the issue of punitive damages. This issue is moot in this appeal because the jury found in favor of Brockmeier, and Mr. Courtney's counsel conceded at oral argument that punitive damages cannot be awarded without compensatory damages. However, by this decision, we reverse the judgment in this case and remand for retrial as to all defendants. We thus address this assignment of error to aid in retrial. We hold that, on this record, there was sufficient evidence presented to raise a jury question as to whether Brockmeier acted in reckless disregard of his patient's care and safety.

---

5. (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673.

6. See, generally, *Covington v. Sawyer* (1983), 9 Ohio App.3d 40, 9 OBR 43, 458 N.E.2d 465.

The judgment entered on the jury's verdict is reversed, and the cause is remanded for retrial as to all defendants.

*Judgment reversed*
*and cause remanded.*

HILDEBRANDT, P.J., and GORMAN, J., concur.